Stephenson, J.
 

 The Gas Company complains generally that the Commission, in its process of fixing the rate herein, has not followed the procedural requirements, and has thereby denied to it due process of law, and that the rate fixéd by the Commission is unreasonable and unlawful.
 

 We will consider the specific questions raised in the Lima case in inverse order.
 

 The valuation fixed by the Commission on September 15, 1931, for property used and useful in the city of Lima, as of a date certain, to wit, March 31, 1928, the effective date of the rate ordinance passed by the city, was in the amount of $1,901,696. Protests against such valuation were filed by both the Gas Company and the city, but no review of this order was had, and this sum so fixed must be regarded as a valuation binding upon the Gas Company and the city alike, and is the rate base.
 

 The Gas Company complains that the Commission in fixing the rate did not take into consideration the one per'cent, increase in the state excise tax, which became effective April 5, 1932.
 

 Questions arise in every rate-making case, and arise in this case, as to the extent of authority of the Public Utilities Commission in fixing rates.' Someone has said that whereas we formerly had but three branches of government, the executive, judicial and legislative, we now have four, in that we have grown an administrative branch. True, administrative boards are, in
 
 *312
 
 the main, fact finding bodies; but without at least quasi-judicial power they could not justify their existence. We accept the ruling of Chief Justice Hughes as definitive of the powers of administrative bodies, as expressed in
 
 Atchison, Topeka & Santa Fe Ry. Co.
 
 v.
 
 United States,
 
 284 U. S., 248, 76 L. Ed., 273, 52 S. Ct., 146. In this case the Chief Justice was dealing with the powers of the Interstate Commerce Commission. He said:
 

 “We are thus brought to the fundamental considerations governing the authority of the Commission. It has broad powers and a wide extent of administrative discretion, with the exercise of which, upon evidence, and within its statutory limits, the courts do not interfere. The important and salutary functions of the Commission to enforce public rights are not to be denied or impaired. But the Commission, exercising a delegated regulatory authority which does not have the freedom of ownership, operates in a field limited by constitutional rights and legislative requirements.”
 

 The opinion is not quoted in full, as the unquoted part is not pertinent in that it deals with the effect of the Hoch-Smith Resolution upon the powers of the Commission. While a federal administrative board, operating under federal laws, was being dealt with in this opinion, the general principles governing administrative bodies, whether federal or state, are much the same.
 

 In following this rule we are fully cognizant of the seventh paragraph of the syllabus in the case of
 
 Columbus Gas & Fuel Co.
 
 v.
 
 Public Utilities Commission,
 
 and
 
 City of Columbus
 
 v.
 
 Public Utilities Commission,
 
 127 Ohio St., 109, 187 N. E., 7. As has been heretofore said, no question is raised in this case as to the valuation of the Gas Company’s property.
 

 As some of the questions presented herein in effect charge the Commission with an abuse of discretion, it
 
 *313
 
 was deemed proper to announce the rule we would follow.
 

 The one per cent, increase in the excise tax is not given serious consideration by the Gas Company. Section [2294-4], General Code (114 Ohio Laws, pt. 2, 19, Section 4). This tax was effective only slightly more than a year under the ordinance passed by the city of Lima. Taking the gross revenue for 1931 as a basis, the amount would be somewhere between four and five thousand dollars, but such tax was not payable until 1932. The Commission took a four year basis, viz: 1928, 1929, 1930 and 1931. There is. nothing in the record to show that this was an arbitrary basis. There were two fat years and two lean years considered. By considering these four years, an average rate was reached. The Commission barely “got under the wire” with its finding and order, as it was, its finding being announced about a month before the expiration of the ordinance period. The Gas Company, after the matter had been finally and fully submitted and the calculations made on a four year basis, and within a short time before the Commission made its finding and order, asked for a rehearing in which they could submit their 1932 report. To have considered the year 1932 would have required the Commission to revamp all the work it had done, and we do not think it abused its administrative discretion in refusing the application.
 

 Did the Commission err in disallowing the claim of the Gas Company for the amortization of the forty-four mile transmission line in the approximate amount of $23,000 annually?
 

 This court has heretofore held, in
 
 Columbus Gas & Fuel Co.
 
 v.
 
 Public Utilities Commission,
 
 and
 
 City of Columbus
 
 v.
 
 Public Utilities Commission, supra,
 
 that the Ohio legislative formula for arriving at a rate base contained no provision for amortization and that the Commission had no “vestige of discretion” to go be
 
 *314
 
 yond the statute. Our statutes do provide for “Depreciation, if any, *
 
 * *
 
 for existing mechanical deterioration, for age, for obsolescence, for lack of utility or for any other cause
 
 *
 
 * *.” This is a provision of Section 499-9, General Code. It is a fair law, and under it no public utility is saddled with property that is affected with mechanical deterioration. This property phase is considered in determining a rate base. After the rate base has been determined, is it fair to permit the public utility to take out of its earnings an amount equal to the replacement value of the property in question? The Commission found that this transmission line was useful to the Gas Company, and in so finding it does not run counter to the manifest weight of the evidence, as there is evidence in the record to support it.
 

 The Gas Company claims that the Commission is bound by a former order in which it made an allowance for the amortization of this pipe line. That is “water over the dam” and the Commission did not see fit to be further bound by it, nor was it required to be so bound. This order was made April 25, 1925, by the Commission, on the plea of natural gas shortage, which plea at that time had some foundation in fact, but the Gas Company did not set up the amortization for such purpose after allowance; but when, hailed before the .Commission in a rate proceeding it attempts to reassert such claim, when as a matter of fact there is no shortage of natural gas.
 

 It appears from the record that the Gas Company bears all the maintenance expense of this line. It further appears that the entire value of the line allocable to Lima is included in the base of $1,901,696.26 fixed by the Commission as the value of the depreciable property on which the allowance of 1.4 per cent, as an annual depreciation charge was computed. We fail to see wherein the Commission erred in this respect.
 

 The Gas Company excepts to the allowance by the
 
 *315
 
 Commission of 1.4 per cent, of the depreciable property as a reasonable amount for depreciation reserve. The Gas Company contends for 3 per cent.
 

 We have little trouble with this proposition. This finding was made from seven years experience, 1925 to 1931, inclusive, as shown by the Gas Company’s book value. The fact is that the Commission was more liberal in this regard than the book value warranted.
 

 The Commission allowed for general and miscellaneous expense the sum of $44,713, which the Gas Company claims is wrong in four particulars, namely:
 

 1. That there was an error- in mathematical calculation;
 

 2. That nothing was allowed for rate-case expense;
 

 3. That the Commission used the per customer basis in allocating this item instead of a consumption basis;
 

 4. That the Commission overlooked a substantial part of such expenses, as shown by its annual report.
 

 The alleged errors in calculation were treated fairly by the Commission.
 

 ■ It must be conceded that the Gas Company is entitled to a fair and reasonable allowance for rate-case expense. The Gas Company claims an allowance of $33,542.63 for rate-case expense in these proceedings to May 1, 1932. The Commission is not obliged to accept the bald figures of the Gas Company without a showing that the figures are fair and reasonable. Spreading the ámount claimed by the Gas Company over a period of six years, the length of time that this rate case was pending, and allowing, as contended by the Commission, the sum of $5,100 per year, the rate fixed by the Commission would not be lowered. The Commission would have been warranted in ignoring this item of general and miscellaneous expense entirely in the absence of proof that the Gas Company’s book figures represented an amount that was fair and reasonable. The Commission adopted the per customer plan in allocating general and miscellaneous expense
 
 *316
 
 to the city of Lima. The Commission may, in the exercise of its administrative discretion, adopt a plan for the allocation of snch item, and if the plan is fair to both the public utility and the consumer the court will not disturb it.
 

 It is further claimed by the Gas Company that even in its allocation according to the per customer plan, the Commission erred in that it did not give consideration to 470 new customers in four small towns outside the city of Lima added “sometime” in 1931, and 1070 new customers in Delphos added at the end of that year.
 

 An examination of the record develops the fact that the Commission on the per customer averages considered the entire system of the Gas Company in the application of its plan, using the figures obtained from the annual reports as follows:
 

 Aver-
 

 1928 1929 1930 1931 age
 

 $3.77 $3.54 $3.24 $3.71 $3.56 Distribution Expense.
 

 2.14 1.95 1.97 2.11 2.04. Commercial Expense.
 

 .85 1.09 1.14 1.13 1.05 New Business.....
 

 Gen. and Mise. Expense 3.40 4.02 2.85 3.49 3.44
 

 We see nothing unfair in this method, and on readjustments we fail to see where the Gas Company was treated unfairly.
 

 The Commission allowed the sum of $5,000 annually for attaching new business, whereas the Gas Company claims it should have been allowed approximately $12,000.
 

 The Gas Company insists that before the Commission can reduce the amount of this item, as shown by its books,
 
 the Commission must show that such an
 
 ■
 
 amount is unfair and unreasonable.
 

 Such a rule would completely tie the hands of any administrative body. When a public utility by rule of court is enabled to throw its books down in front of
 
 *317
 
 the Public Utilities Commission of the State of Ohio and say to it, “You must accept the figures shown by these books unless and until you have proven them to be untrue,” just then the keys to the Public Utilities Commission may as well be turned over to the public utilities. It would seem, in the contention for such a holding, that the consumer is lost sight of entirely.
 

 It must be remembered that while public utilities are entitled to a fair and reasonable rate of income, based upon a fair and reasonable valuation of their properties, the consumer is at the same time entitled to their product at a fair and reasonable price, to be arrived at by the employment of fair and reasonable means.
 

 The Public Utilities Commission is the arbiter between producer and consumer, and it has fulfilled the purpose of its creation when it treats both fairly.
 

 The consumer is concerned with the continued existence of a producer who affords to him the product of a public utility at a price that is fair and reasonable. Incidentally, he should not, and, so far as the court knows, does not, object to being indirectly assessed in a reasonable amount expended in good faith to assure that continued existence, but that does not mean that he is obliged to pay any amount that the producer sees fit to place on his books.
 

 The Commission found from the testimony that the new business obtained by the Gas Company in Lima did not warrant the expenditure of $12,000 per year for new business — nor the half of it. Counsel have not pointed us to that part of the record showing that it has competition. In the absence of a showing of competition, which the Gas Company undoubtedly would have shown had it been the fact, the Commission had the right to assume that there was no competition, and the fact that there was no competition was a fact which it had a right to take into consideration in determining the amount it would allow. It not being shown that there was competition, the case of
 
 Con
 
 
 *318
 

 solidated Gas Co.
 
 v.
 
 Newton,
 
 267 Fed., 231, is not in point.
 

 The effect of the holding in the cases of
 
 Brooklyn Borough Gas Co.
 
 v.
 
 Prendergast,
 
 16 Fed. (2d), 615,
 
 Monroe Gaslight & Fuel Co.
 
 v.
 
 Michigan Public Utilities Co.,
 
 11 Fed. (2d), 319, and
 
 Citizens Gas Co.
 
 v.
 
 Public Service Comm. of Missouri,
 
 8 Fed. (2d), 632, 634, is simply to criticize the different administrative bodies for assuming to manage the public utilities involved.
 

 All these decisions are in jurisdictions outside of Ohio and involve a different statutory set-up, and, while we respect these decisions as emanating from the very ablest jurists, we do not feel bound by them unless they are attuned to our statutory law.
 

 It is a matter of common sense, as well as law, that the members of the Public Utilities Commission of Ohio cannot substitute themselves as managers of the Gas Company, or dictate its policies, and in their finding they expressly disclaim any such intention. Of course such disclaimer would amount to nothing if their action was so grossly arbitrary as to indicate to an unbiased mind that they were assuming to manage the Gas Company and dictate its policies.
 

 The case of
 
 Ohio Utilities Co.
 
 v.
 
 Public Utilities Commission,
 
 267 U. S., 359, 69 L. Ed., 656, 45 S. Ct., 259, is cited by counsel as bearing upon several questions involved in this case. It is insisted that this case has particular application to this item of new business. This is an Ohio case, and we follow it without hesitation. We quote the syllabus in full, as reported in 69 L. Ed.:
 

 “1. Reproduction value of the property of a public utility for rate-making purposes is not a matter of outlay, but of estimate; and should include a reasonable allowance for. organization and other overhead charges that necessarily would be incurred in reproducing the utility.
 

 
 *319
 

 “2.
 
 An item of interest included in the engineer’s estimate of the reproduction value of a public utility, based on an estimate of the time necessary for construction, and allowance of interest on the estimated cost for one half that time, cannot be reduced by the commission without justification.
 

 “3. In the absence of evidence to the contrary, the commission cannot arbitrarily reduce the estimate of its own engineers as to the necessary working capital of a public utility for rate-making purposes.
 

 “4. Limiting a public utility to a return of less than 5 per cent upon the value of its property unconstitutionally deprives it of its property without due process of law.”
 

 It is well to remember that this decision was rendered by the Supreme Court of the United States at its October Term, 1924.
 

 This case does not directly touch the question of allowance for new business, and we may say in passing that no case is cited wherein the question as it arises in this case is treated. The case last referred to simply makes plain the rule that the Commission cannot act arbitrarily.
 

 The case of
 
 Consolidated Gas Co.
 
 v.
 
 Newton, supra,
 
 is the nearest case in point. We quote the syllabus and part of the dictum, viz:
 

 “The cost of a department of a gas company for the promotion of the sale of gas, and gas using machines and appliances
 
 held
 
 a legitimate item of the expense of distribution.”
 

 At page 353, under the head of “Distribution Expenses,” sub-head “Promotion Expense for Gas Appliances and Gas Utilization,” the court says:
 

 “These items include the cost of maintaining these departments which the company organized some years ago to push the sale of gas and of machines to burn gas. Their propriety is challenged largely because the sales have not increased much. The truth appears to
 
 *320
 
 be that the constantly increasing use of electricity for illumination has driven out gas more and more, until to hold its sales plaintiff must promote the use of gas for heating and cooking * * *. Advertisement, when not pushed to the useless extreme which competition too often engenders, is a necessary function. In its proper sense it means, not the creation of a factitious demand by the familiar process of repeated suggestion, but genuine information in such form as to reach the public.”
 

 In this field a reasonable price for gas was charged. There was competition. The company maintained and had been maintaining for some years a separate department for the exercise of this function. We have no such state of facts in this case. The Lima field is small. There is no competition. The price charged for a mixed gas of low B. T. U. content is almost prohibitive. All these facts were known to the Commission, and it refused to accept the figures produced by the Gas Company without some further proof as to their legitimacy.
 

 Under all the facts and circumstances,' we find no prejudicial error in the action of the Commission in this regard.
 

 The difference in the amount of allowances for commercial expenses and distribution expense made by the Commission, and that claimed by the Gas Company, was brought about by the per customer method of allocation, which we have hereinbefore found to be fair. The Gas Company claims that it loses 9 per cent, of all the gas it sells. The Commission went into the integrity of this claim, and made a finding that the Gas Company has considerably more mains and lines than is necessary to supply the city of Lima, and allowed 7 per cent., stating:
 

 ‘ ‘ This reduction of 2 per cent, in leakage is reflected in a corresponding reduction in the cost of gas sold which appears in the operating statistics * *
 

 
 *321
 
 The Gas Company contends that this finding of the Commission violates the case of
 
 Brooklyn Union Gas Co.
 
 v.
 
 Prendergast,
 
 7 Fed. (2d), 628.
 

 We find that the twenty-first paragraph of the syllabus in that case announces a general rule, viz:
 

 “Unaccounted for gas, due to leakage, condensation, expansion, contraction, etc., should be allowed for on basis of experience of the company, and not at an arbitrary figure.”
 

 No fault can be found with this rule, where the integrity of the item is not attacked.
 

 We further find, sixteenth paragraph of the syllabus, that the court may consider the testimony of the gas company’s experts in the light of cross-examination.
 

 That any gas company should lose almost one-tenth of its product by leakage, condensation, expansion, contraction, etc., is so unreasonable on its face as to warrant investigation. From the record in this case, we find that the allowance of 7 per cent, is fair and reasonable.
 

 The Gas Company claims that anything less than 8 per cent, net income is confiscatory in its case, for the reason that its capital obtained from sale of bonds costs it 7.07 per cent, and from sale of preferred stock 8 per cent.
 

 Just how far can a public utility be encouraged in paying a high price for its money?
 

 It appeals to this court that any concern that loses almost ten per cent, of its out-put, and at the same time pays almost eight per cent, for its money, is headed for the rocks.
 

 We are not denying a reasonable amount for financing. In just one Ohio case do we find where an allowance was made for money paid for the use of money, and that was the case of
 
 Ohio Utilities Co.
 
 v.
 
 Public Utilities Commission, supra,
 
 wherein the court held that in arriving at reproduction value an item of in
 
 *322
 
 terest included in the. engineer’s estimate, based on an estimated length of time necessary for construction and an allowance of interest (6 per cent.) on the estimated cost for one-half of that time, cannot be reduced by the Commission without justification.
 

 This as a matter of fact was an allowance of 3 per cent, for full time.
 

 After reconciling arithmetical errors and considering discrepancies, the Commission arrived at an average net rate of about 6 per cent, per annum. While there are some irregularities in some of the findings and rulings of the Commission, they are not of such character as to warrant a disturbance of their order.
 

 We come now to the consideration of the Kenton case, No. 24105.
 

 This case will be treated briefly, as practically all the questions raised in this case were passed on in the Lima case, No. 24104. It was on this account that they were submitted together.
 

 On July 16, 1929, the city council of Kenton passed an ordinance fixing the rates to be charged by the Gas Company within the city of Kenton for a period of two yearsy from and after August 16, 1929. The Gas Company electing to collect the rates in effect prior to the passage of the ordinance, pending the appeal, gave bond to guarantee repayment of any excess rates that might finally be determined to have been collected by it.
 

 The West Ohio Gas Company purchased natural gas from the Ohio Fuel Gas Company tinder a contract calling for a purchase price of 55 cents per M c. f. This gas is then distributed to consumers in the city of Kenton.
 

 The Commission fixed the sum of $189,844.81 as the value of the Gas Company’s property to be used as a rate base for the two year period of the ordinance, as of a date certain, to wit, August 1, 1929. This valúa
 
 *323
 
 tion can not now be disturbed, nor can the gate rate of 55 cents be departed from.
 

 On March 10, 1933, the Commission found that the rates fixed by the Kenton ordinance were insufficient, unjust and unreasonable, and it fixed the rates to be charged in the city of Kenton during the ordinance period as follows:
 

 “400 cubic feet of gas or $1.00 less used per month
 

 95‡
 
 per thousand cubic feet “Next 2600 cubic feet used per month
 

 85^ per thousand cubic feet “Next 3500 cubic feet used per month
 

 per thousand cubic, feet “Next 3500 cubic feet used per month
 

 ‘ ‘ Over 10,000 cubic feet used per month
 
 75‡
 
 per thousand cubic feet
 

 “House Heating as defined by Co.’s schedule on file 60^ per thousand cubic feet.”
 

 The Commission thereupon ordered the Gas Company to refund, as per the previous arrangement.
 

 It is estimated that the amount to be refunded during the ordinance period will approximate $40,000.
 

 On March 18, 1933, the Gas Company filed its application for rehearing with the Commission, in which application it set out many alleged errors and irregularities which it claimed rendered the Commission’s order unlawful. In such application it ashed leave to be permitted to show the facts as to its decreased revenues and its net earnings from the service in Kenton for the year 1932 and the current year. On March 22, 1933, the Commission deified the application for rehearing, and on April 1, 1933, the Gas Company filed its petition in error in this court, praying that the proceedings of the Commission herein be reviewed and reversed.
 

 The period used by the Commission for its computa
 
 *324
 
 tions was the twelve month period ending August 1, 1929.
 

 The same question of unaccounted for gas arises in this case, the Gas Company claiming 10 per cent, and the Commission allowing 5 per cent.
 

 The Gas Company claimed an allowance for General and Miscellaneous Expense in the sum of $10,-979.63. The Commission allowed the sum of $6,556.26. It is noted, however, that the sum of $2,069.00 should have been and was added to this sum allowed by the Commission to cure an error made by the Commission in omitting certain expenses.
 

 This difference was occasioned by the difference in the methods of allocation used and the refusal of the Commission to allow the claim for rate case expense.
 

 For depreciation the same claim was made as in the Lima case.
 

 The Gas Company claims an allowance for Excise Tax $1,226.31. The Commission allowed the sum of $1,144.62, there being a difference of $81.69. This difference is so small as to be of no consequence.
 

 No authority is cited to support this allowance, nor has authority been cited to warrant disallowance. The allowance has been made and we will not disturb it one way or another.
 

 The Gas Company claimed an Income Tax Allowance of $1,809.00. The Commission allowed the sum of $1,751.62; a difference of $57.38.
 

 The total difference between the Gas Company and the Commission on all items amounted to $8,978.42.
 

 On the basis of this difference in operating expense, using the valuation fixed by the Commission, the Commission found that the Gas Company’s rate of income was altogether too liberal when the consumer was given consideration.
 

 We have examined the Gas Company’s reports and the Commission’s tabulations, and we fail to see wherein the Commission has committed grievous error.
 

 
 *325
 
 The Commission found the gross revenues of the Gas Company from gas service in Kenton for the year ending August 11, 1929, to be $84,787.36. Total expenses for such time, deduct $61,497.10. Leaving a net income of $23,290.26. Divided by $189,844.81 produces 12.27 per cent, net income.
 

 The Commission fixed 6 per cent, as a fair net income. Six per cent, of $189,844.81 produced in dollars $11,391, and fixed a rate calculated to scale the net income from 12.27 per cent, to 6 per cent., and in the light of the times this is not error.
 

 We do not find the rates fixed in either of these cases to be unreasonable or unlawful, and the orders of the Public Utilities Commission of Ohio made in each and both cases are hereby affirmed.
 

 Orders affirmed.
 

 Weygandt, C. J., Matthias, Beyis and Zimmerman, JJ., concur.
 

 Wilkin, J., not participating.