## WEST OHIO GAS CO. *v.* PUBLIC UTILITIES COMMISSION OF OHIO. (No. 1).

No. 212. Submitted December 7, 1934.—Decided January 7, 1935.

---

64

*Messrs. Edmond W. Hebel, Harry O. Bentley,* and *Charles C. Marshall* submitted for appellant.

*Mr. John W. Bricker,* Attorney General of Ohio, and *Mr. Donald C. Power,* Assistant Attorney General, submitted for appellee.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

The appellant, West Ohio Gas Company, supplies gas to the inhabitants of the city of Lima, Ohio, and to neighboring communities, part of what it sells being artificial gas manufactured by itself and part natural gas bought from another company which is wholly independent.

On March 19, 1928, the municipal authorities of the city of Lima passed an ordinance, effective April 19, prescribing the maximum price to be charged for gas to consumers within the city during a period of five years. The rates were to be as follows: for the first 1,000 cubic feet of gas, 90 cents per month; for the next 3,000 cubic

feet per month, 80 cents per M c. f.; for the next 6,000, 75 cents per M c. f.; and for all over 10,000 per month, 55 cents per M c. f. This was a sharp reduction of the rates previously charged, which were $1.25 for the first 400 cubic feet; $1.05 for the next 9,600 cubic feet; $1 for the next 15,000; and for all over 25,000, 75 cents per M c. f.

In adherence to the Ohio statutes (Ohio General Code, §§ 614-44 *et seq.*), the company filed a complaint with the Public Utilities Commission of Ohio, protesting against the ordinance, praying that the commission fix a fair and reasonable schedule, electing, as it might, to charge in the meantime the rates previously in force, and giving bond for the return of the excess, if any. The hearings before the Commission began in July, 1928, and ended in July, 1932. While the proceeding was pending, there was a final order of valuation, made in January, 1932, whereby the value of the property in Lima, used and useful for the business, was fixed at $1,901,696.26 as of March 31, 1928, approximately the date of the adoption of the ordinance. There being no appeal from that order within the time prescribed by law, it became binding on the company, as well as on the commission, though the valuation was less than the company had urged. 128 Ohio St. 301, 311; 191 N. E. 105. The rate base being thus established, what was next to be ascertained was the amount of the operating expenses as compared with the gross income, after which a conclusion could be drawn as to the rates that would be necessary for a fair return on the investment. An order entered by the commission on March 10, 1933, adjudged the rates under the ordinance to be insufficient and unjust. It substituted rates averaging about 13½% less than those that the company had been charging: for 400 cubic feet or less per month, $1; for the next 9,600, 95 cents per M c. f.; for anything in excess of 10,000 cubic feet per month, 75

cents per M c. f., with penalties to be charged if payment was delayed. The rates so fixed were to be retroactive as of the effective date of the ordinance, April 19, 1928, from which time they were to remain in force for a term of five years, and the difference between their yield and the amount collected by the company was to be refunded to consumers. A motion for a rehearing having been denied, the company filed a petition in error with the Supreme Court of Ohio, invoking the protection of the Fourteenth Amendment. The order of the commission was affirmed, 128 Ohio St. 301; 191 N. E. 105; and the case is here upon appeal.

The commission made its order, as it has informed us by an amended opinion, in the belief that the new rates would yield a return of 6.65% on the value of the property included in the base. Its estimate was wide of the mark as a result of mathematical errors, and this on the assumption that its rulings as to the items of operating expenses to be allowed or disallowed were correct in fact and law. Even on that assumption, the average net income during the four years of the ordinance period for which figures were available was $109,414, which upon a rate base of $1,901,696 is equivalent to an average return of about 5.75%. This is now admitted by counsel for the commission, and must be accepted as a datum. What is still to be determined is whether the rate of return has been further overestimated to the point of confiscation through error in the rejection of charges upon income.

1. The company made claim to an allowance for " unaccounted for gas," which is gas lost as a result of leakage, condensation, expansion or contraction. There is no dispute that a certain loss through these causes is unavoidable, no matter how carefully the business is conducted. Cf. *Consolidated Gas Co.* v. *Newton*, 267 Fed. 231, 244; *Brooklyn Union Gas Co.* v. *Prendergast*, 7 F. (2d) 628, 652, 671. The company, basing its claim upon its

proved experience, reported the average loss as 9% per annum. The Commission fixed the allowance at 7%, thereby reducing the operating expenses by $3,800 a year. In making this reduction, it did not deny that the loss had been suffered to the extent stated by the company. The presumption of correctness that gives aid in controversies of this order to the books of public service corporations (*Consolidated Gas Co.* v. *Newton, supra,* at p. 242; *Newton* v. *Consolidated Gas Co.,* 258 U. S. 165, 176) was confirmed in this instance by what amounts to a finding of regularity. Accepting the loss as proved, the commission refused to allow it for more than 7% upon the ground that with proper care of the system the loss would have been less. A public utility will not be permitted to include negligent or wasteful losses among its operating charges. The waste or negligence, however, must be established by evidence of one kind or another, either direct or circumstantial. In all the pages of this record, there is neither a word nor a circumstance to charge the management with fault. Cf. *Ohio Utilities Co.* v. *Public Utilities Commission of Ohio,* 267 U. S. 359, 363. There is not even the shadow of a warning to the company that fault was imputed and that it must give evidence of care. Without anything to suggest that there was such an issue in the case, the commission struck off 2%; it might with as much reason have struck off 4 or 6. This was wholly arbitrary. *Ohio Utilities Co.* v. *Public Utilities Commission of Ohio, supra.*

Under the statutes of Ohio no provision is made for a review of the order of the Commission by a separate or independent suit. The sole method of review is by petition in error to the Ohio Supreme Court, which considers both the law and the facts. *Dayton P. & L. Co.* v. *P. U. Commission of Ohio,* 292 U. S. 290, 302; *Hocking Valley Ry. Co.* v. *Public Utilities Commission,* 100 Ohio St. 321, 326, 327; 126 N. E. 397. To make such review adequate

the record must exhibit in some way the facts relied upon by the court to repel unimpeached evidence submitted for the company. If that were not so, a complainant would be helpless, for the inference would always be possible that the court and the Commission had drawn upon undisclosed sources of information unavailable to others. A hearing is not judicial, at least in any adequate sense, unless the evidence can be known.

2. The company made claim to an allowance of " distribution expenses " incurred in the superintendence of distribution, in work on the premises of customers incidental to the service, in the change of meters used to measure the gas sold, and in the maintenance of local mains and equipment. There is no denial, even now, that these expenses were incurred as claimed. There was no challenge upon the trial to the practice of the company whereby moneys spent in Lima, the territorial unit affected by the ordinance, were allocated to that city, and not to territory beyond. The case was tried on the assumption that the practice was acceptable and was so submitted for decision. Eight months later, on the eve of a determination, the commission conceived the thought that distribution costs in Lima should be borne also by consumers in outlying communities (including the city of Kenton) served by the same company, which would mean, of course, that like expenses in the other communities must be borne by residents of Lima. Up to that stage the data were lacking for a division on that basis. Accordingly, by an order made *ex parte* on March 8, 1933, without the appellant's knowledge, the commission directed of its own motion that the annual reports for the years 1928 to 1931 inclusive be introduced in evidence and made a part of the record. On the basis of these reports it ascertained the average distribution expense per customer for all the eleven communities served by the appellant, multiplied this average by the number

of customers in Lima, and thus arrived at the share to be allocated to that city in the determination of the local rates. By that mode of apportionment, the operating expenses were reduced to the extent of $6,200 annually.

We do not now decide that there would be a denial of due process through the spread of distributing costs over the total area of service, if the new method of allocation had been adopted after timely notice to the company and then consistently applied. This court does not sit as a board of revision with power to review the action of administrative agencies upon grounds unrelated to the maintenance of constitutional immunities. *Los Angeles Gas & Electric Corp.* v. *Railroad Commission of California,* 289 U. S. 287. Our inquiry in rate cases coming here from the state courts is whether the action of the state officials in the totality of its consequences is consistent with the enjoyment by the regulated utility of a revenue something higher than the line of confiscation. If this level is attained, and attained with suitable opportunity through evidence and argument (*Southern Ry. Co.* v. *Virginia,* 290 U. S. 190) to challenge the result, there is no denial of due process, though the proceeding is shot through with irregularity or error. But the weakness of the case for the appellee is that the fundamentals of a fair hearing were not conceded to the company. Opportunity did not exist to supplement or explain the annual reports as to the distribution of the expenses in the neighboring communities, nor did opportunity exist to bring the rates outside of Lima into harmony with the exigencies of a new method of allocation adopted without warning.

The need for such an opportunity is brought into clear relief by the record in number 213, a case submitted along with this one, and within the range of our judicial notice. *Butler* v. *Eaton,* 141 U. S. 240, 243, 244; *Aspen Mining & Smelting Co.* v. *Billings,* 150 U. S. 31, 38; *Bienville*

*Water Supply Co.* v. *Mobile,* 186 U. S. 212, 217; *Fritzlen* v. *Boatmen's Bank,* 212 U. S. 364, 370. The subject matter of that case was the rate schedule for the city of Kenton, served with gas by the appellant. In Kenton, unlike Lima, a spread of distribution costs over the whole area of service would have been favorable to the appellant and unfavorable to customers. Strange to say, the commission, though prescribing the larger area for Lima, adopted the smaller one for Kenton, and this by a decision rendered the same day. An injustice so obvious may not be suffered to prevail. The commission by its counsel suggests as an excuse that a division on a different basis was not requested by the company. There was no reason to request it, for the record as made up when the case was finally submitted did not contain the necessary data for a spread over a larger area, nor was there any hint by the commission that such a division was in view. Manifestly, whatever territorial unit is adopted must be made use of consistently, and regardless of the consequences. If a different course were to be followed, there would be less than full requital after all the communities affected had contributed their quotas.

To resume: division on one basis in Lima and on another basis in Kenton, all without notice to the company that the spread was to be altered and new evidence received, was an exercise of arbitrary power, at variance with " the rudiments of fair play " (*Chicago, M. & St. P. Ry. Co.* v. *Polt,* 232 U. S. 165, 168) long known to our law. The Fourteenth Amendment condemns such methods and defeats them.

3. The company made claim to commercial expenses incurred in reading the meters of the customers, keeping their accounts, and sending out and collecting bills. The commission treated these items the same way that it treated the expenses of distribution, and spread them over the whole territory instead of confining them to Lima. The result was a reduction of operating expenses

to the extent of $1,085.25 yearly. For reasons already stated, the reduction may not stand.

4. The company made claim to expenses incurred in procuring new business or in the endeavor to procure it, such expenses amounting on the average to $12,000 a year. The commission did not question the fact of payment, but cut down the allowance to $5,000 a year on the ground that anything more was unnecessary and wasteful. The criticism has no basis in evidence, either direct or circumstantial. Good faith is to be presumed on the part of the managers of a business. *Southwestern Bell Telephone Co.* v. *Public Service Commission of Missouri*, 262 U. S. 276, 288, 289. In the absence of a showing of inefficiency or improvidence, a court will not substitute its judgment for theirs as to the measure of a prudent outlay. *Banton* v. *Belt Line Ry. Corp.*, 268 U. S. 413, 421; *Brooklyn Borough Gas Co.* v. *Prendergast,* 16 F. (2d) 615, 623; *New York & Richmond Gas Co.* v. *Prendergast,* 10 F. (2d) 167, 181. The suggestion is made that there is no evidence of competition. We take judicial notice of the fact that gas is in competition with other forms of fuel, such as oil and electricity. A business never stands still. It either grows or decays. Within the limits of reason, advertising or development expenses to foster normal growth are legitimate charges upon income for rate purposes as for others. *Consolidated Gas Co.* v. *Newton, supra,* at p. 253. When a business disintegrates, there is damage to the stockholders, but damage also to the customers in the cost or quality of service.

5. The company made claim to an allowance of the expenses of the rate litigation amounting in all to about $30,000, to be spread in equal parts over a term of five years, the duration of the ordinance. No part of these expenses has been allowed, though apparently both commission and court intended to allow them, spreading them, however, over a term of six years instead of five. " It

must be conceded," said the court, "that the gas company is entitled to a fair and reasonable allowance for rate case expenses." This is followed by the statement that if the spread be six years (instead of five), and $5,100 be allowed for each of those years " as contended by the commission," the rate fixed by the order will give an adequate return. True there is also the statement that the commission would have been warranted in ignoring this item altogether " in the absence of proof that the gas company's book figures represented an amount that was fair and reasonable." Even in that remark the implication is obvious that this is not what the commission did. Moreover, there is nothing in the record justifying an inference that the figures were erroneous or the payments improvident. *Consolidated Gas Co.* v. *Newton, supra,* at p. 242; *Newton* v. *Consolidated Gas Co., supra,* at p. 176. The course of the trial exhibits very clearly the understanding of the parties that expenditures shown by the books would be deemed to have been made in good faith and with reasonable judgment unless evidence was at hand overcoming the presumption. In the absence of any challenge of their necessity or fairness, we must view them as they were accepted by the triers of the facts.

Thus viewing them, we think they must be included among the costs of operation in the computation of a fair return. The company had complained to the Commission that an ordinance regulating its rates was in contravention of the statutes of the state and of the Constitution of the nation. In that complaint it prevailed. The charges of engineers and counsel, incurred in defense of its security and perhaps its very life, were as appropriate and even necessary as expenses could well be.

A different case would be here if the company's complaint had been unfounded, or if the cost of the proceeding had been swollen by untenable objections. There is neither evidence nor even claim that the conduct of the company's representatives was open to that reproach.

The statute laid a duty on the commission, when it found the ordinance unjust, to prescribe its own schedule. The one it adopted, though higher than the one condemned, did not satisfy the company, but there was nothing unreasonable or obstructive in laying before the commission whatever data might be helpful to that body in reaching a considered judgment. Indeed, we shall be brought to the conclusion, if we analyze the record, that the two phases of the controversy were substantially coincident. Everything relevant to the schedule adopted by the commission was relevant also to an inquiry into the fairness of the ordinance.

In this matter of rate case expenses, we must distinguish between the function of a court and that of a commission. A court passing upon a challenge to the validity of statutory rates does not determine the rates to be adopted as a substitute. *Central Kentucky Natural Gas Co.* v. *Railroad Commission of Kentucky,* 290 U. S. 264, 271, 272; *Newton* v. *Consolidated Gas Co., supra.* If the rates are inadequate to the point of confiscation, the complainant has no need, it is said, to count upon the expenses of the lawsuit; if they are not already inadequate, the lawsuit cannot make them so. Cf. *Columbus Gas & Fuel Co.* v. *City of Columbus,* 17 F. (2d) 630, 640. An argument to that effect runs through some of the decisions, though we are not required now either to accept or to reject it. But the case is different where a commission, after setting a schedule of rates aside, is empowered to substitute another to take effect by retroaction and cover the same years. In determining what the substitute shall be, the commission must give heed to all legitimate expenses that will be charges upon income during the term of regulation, and in such a reckoning the expenses of the controversy engendered by the ordinance must have a place like any others. *Denver Union Stockyard Co.* v. *United States,* 57 F. (2d) 735, 753, 754; *New York & Richmond Gas Co.* v. *Prendergast, supra,* at pp. 181, 182;

*Monroe Gas Light Co.* v. *Michigan Public Utilities Commission,* 11 F. (2d) 319, 325.

There are suggestions in the books that the cost of litigation is to be reckoned as an extraordinary expense and so a charge upon capital rather than a charge upon income to be paid out of the revenues of one year or of many. Cf. *New York & Queens Gas Co.* v. *Newton,* 269 Fed. 277, 290; *Reno P. L. & W. Co.* v. *Public Service Commission,* 298 Fed. 790, 801; *contra, New York & Richmond Gas Co.* v. *Prendergast, supra,* at pp. 181, 182; *Mobile Gas Co.* v. *Patterson,* 293 Fed. 208, 224. There is no need to consider what practice is to be followed where the rate is prescribed for a period of indefinite duration, though there would seem to be little difficulty in amortizing the charge over a reasonable term. Cf. *New York & Richmond Gas Co.* v. *Prendergast, supra.* In the case at hand, the period of duration has been definitely fixed, and the charge upon the income can be distributed accordingly.

We conclude that an addition of $5,100 must be made to the yearly operating expenses as the cost of proceedings necessary to keep the business going. Cf. *Kornhauser* v. *United States,* 276 U. S. 145. The company makes no point as to the ruling of the commission that the cost should be spread over six years instead of five, and we follow that concession.

6. The items enumerated in subdivisions 1 to 5 of this opinion amount altogether to $23,185.25 annually. Added to the operating charges they reduce the net income from $109,414 to $86,228.75, or about 4.53% upon the rate base of $1,901,696. This is too low a rate to satisfy the requirements of the Constitution when applied to a corporation engaged in the sale of gas during the years 1928 to 1931, two at least of the four years being before the days of the depression. *Los Angeles Gas & Electric Co.* v. *Railroad Commission of California, supra,* at pp. 319, 320; *Dayton Power & Light Co.* v.

*Public Utilities Commission of Ohio,* 292 U. S. 290, 311; *Southwestern Bell Telephone Co.* v. *Public Service Commission, supra,* at p. 288; *Ohio Utilities Co.* v. *Public Utilities Commission of Ohio, supra,* at p. 364.

Counsel for the commission argues that disbursements for charitable and other gifts, allowed by the commission, ought in law to have been excluded. This may well be, but the record is too meagre to enable us to ascertain with certainty the reasons for the payments. Cf. *Old Mission Portland Cement Co.* v. *Helvering,* 293 U. S. 289; In re Southern California Edison Co., P. U. R. (1924c) 1, at pp. 32, 33. We do not feel at liberty to eliminate them upon inconclusive testimony when court and commission have treated them as proper. If, however, all were to be dropped, the increment to the rate would be only about one-tenth of one per cent. The change would be too small to induce a different conclusion.

Counsel also argues that the rate base, though fixed by the commission in January, 1932, was determined as of March, 1928, when the ordinance was passed, and we are reminded that since that time there has been a marked decline of values, at least during the later years of the period affected. How great the decline has been we cannot learn with any accuracy from the record now before us. The value fixed by the commission was adopted as the base on which to estimate the rate of return at the beginning of the period, but also at the end. The company acquiesced, believing that the valuation would be effective during every portion of the term, and abandoned the appeal it might otherwise have taken. Under the statutes of Ohio the " sum so fixed must be regarded as a valuation binding upon the Gas Company and the city alike, and is the rate base." 128 Ohio St. 301; 191 N. E. 105. No other sum was considered by the commission, or deemed to be properly before it. No other sum was subject to consideration upon the petition in error to

the court. To put into the case now an issue heretofore· kept out of it and thereby reach another value would be a denial of a full and fair hearing by the tribunals of the state, a denial forbidden by the constitution of the nation. If the appellee may be heard to say that during some part of the term the valuation was too high, the company must be free to urge that at other times it was too low. Upon the record now submitted to us no such issue is involved. To bring it into the case at all there is need of a new hearing with a new reckoning of the rate base, unhampered by restrictions to any single point of time. Only in that way can review be full and fair.

7. The company makes the claim that it has received an inadequate allowance to the extent of $28,021.40 for depreciation reserve, and that it should have been permitted to amortize the value of a transmission main extending from Lima to fields of natural gas, thereby adding $22,935.97 to its operating charges.

We have considered these objections, and are unable to uphold them.

The decree is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

Mr. Justice Stone, concurring.

As there was a denial of due process by· the Commission in arbitrarily reducing the allowance for " unaccounted for gas," and in failing to apply consistently either of the two methods of allocation of distribution and commercial expenses adopted in the two cases submitted to us, I concur in the judgment of the Court that the case must be remanded for further proceedings. But with two of the conclusions in the opinion I am unable to agree.

1. I think that the petitioner has failed to sustain the burden, which rests upon it in a confiscation case from

a state court as well as from any other, to show that the item of expense for " new business " was a proper charge against gross income. The property for which constitutional protection is invoked is that " used and useful in the public service," not the enlarged business of the future which petitioner hopes to obtain through the present expenditure of money. I know of no constitutional principle upon which this expenditure must be taken from the pockets of the patrons of the present business, any more than the cost of future service lines required to carry on the new business. The record does not suggest that the expenditure for new business was necessary to prevent shrinkage of the present business, and the petitioner has failed to show that the charge is not a capital charge, which it appears on its face to be. If the action of the Commission with respect to this item alone were sustained, the rate of return, as found by this court, would be increased to 4.91%.

2. I am not prepared to say that petitioner sustains the burden of showing confiscation, by showing a rate of return even as low as 4.91% where it is upon reproduction value determined as of March 31, 1928. We judicially know, and cannot ignore, the large declines in price levels and the earnings of capital which have taken place since that date. The period for which the ordinance fixed the rate extends from April 19, 1928, to April 19, 1933. At least three of the five years are those of declining prices and diminishing capital returns. Since the commission's order was based on known income for four of the five years, the possibly lowered revenues of the fifth year cannot be taken to off-set the effect of the declining prices and capital returns. The record gives no hint of what the rate base would be were it ascertained for the entire period. While the Commission and the Ohio courts are bound to adopt a rate base determined as of the beginning of the ordinance period, this does not relieve the com-

pany of the burden of showing that the value of the property for the entire period is such that the net return under the Commission's rates would have been so low as to confiscate its property. See *Los Angeles Gas & Electric Corp.* v. *Railroad Commission,* 289 U. S. 287, 304. No contention is made that the Ohio procedure precludes such proof or that it prevented petitioner from showing facts which would establish confiscation.

WEST OHIO GAS CO. *v.* PUBLIC UTILITIES COMMISSION OF OHIO. (No. 2).

No. 213. Submitted December 7, 1934.—Decided January 7, 1935.

*Messrs. Edmond W. Hebel, Harry O. Bentley,* and *Charles C. Marshall* submitted for appellant.

*Mr. John W. Bricker,* Attorney General of Ohio, and *Mr. Donald C. Power,* Assistant Attorney General, submitted for appellee.