Matthias, J.
 

 This is a proceeding in error from the order of the Public Utilities Commission of Ohio, entered after a hearing upon a citation theretofore issued to the New York Central Railroad Company to show cause why it should not be required to discontinue the practice of switching cars with a locomotive crane at Thurston, Ohio.
 

 The commission found that the locomotive crane in question is used in switching cars, and that such “operation is within the purview of Section 12557-1 of the General Code of Ohio, which prescribes that
 
 *384
 
 an engine or locomotive so employed shall he manned with a full crew of competent employees, consisting of at, least one engineer, one fireman, one conductor, and two helpers; * * # that the use and operation of said locomotive crane to switch cars for the respondent at Thurston, Ohio, with a crew which does not consist of at least the minimum prescribed by Section 12557-1, General Code of Ohio, as aforesaid, is in violation of the laws of the state of Ohio.”
 

 As a result of said finding the commission issued the following order: “That said New York Central Railroad Company be and hereby it is notified, directed, and required to cease and desist from the use of the locomotive crane for the switching of cars upon its tracks at Thurston, Ohio, unless such locomotive crane is manned with a full crew of competent employees, which shall consist of at least one engineer, one fireman, one conductor, and two helpers, as provided by Section 12557-1, General Code of Ohio.”
 

 The record discloses very little disagreement as to the facts. The plaintiff in error maintains what it calls a “stores yard” at Thurston, where it keeps various materials for use in the construction, operation, and maintenance of its lines of railway. Upon the arrival of cars containing any such material, they are placed by the engine of the local train on certain designated tracks. There are several lines of tracks, designated as “stores yard tracks,” located on each side of what is called the Eastern Division main track. Cars containing such material are shifted from place to place in the stores yard by a so-called locomotive crane, so that the materials
 
 *385
 
 may be unloaded at the desired location, and in like manner the locomotive crane is used to move cars from place to place in the process of loading with materials thereafter to be shipped to other points. The record discloses that this locomotive crane will and does move cars as far as 400 yards, has moved as many as four cars at one time, and upon occasion from time to time crosses over the main track.
 

 The contention is made that the Public Utilities Commission of Ohio has no jurisdiction to enforce the provisions of Section 12557-1, General Code, and hence that the order issued by it in this proceeding is without authority.
 

 It has been repeatedly held that the powers of the Public Utilities Commission are conferred by statute, and it possesses no authority other than that thus vested in it.
 
 City of Cincinnati
 
 v.
 
 Public Utilities Commission,
 
 96 Ohio St., 270, 117 N. E., 381, and subsequent cases. But authority has been conferred upon the commission by Sections 576 and 601 of the General Code. By the former it is authorized and directed to “inquire into any neglect or violation of the laws of this state by a railroad doing business in this state, by its officers, agents or employees, or by any person operating a railroad.” It is further directed to “enforce the provisions of this chapter, as well as all other laws relating to railroads and report violations thereof to the Attorney General.” Section 601, General Code, authorizes the commission to examine into any complaint that “a railroad or any officer, agent, or employee thereof has violated or is violating any law of the state. ’ ’
 

 The decision of this court in the case of
 
 State, ex
 
 
 *386
 

 rel. Public Utilities Commission,
 
 v.
 
 N. Y. Cent. Rd. Co.,
 
 115 Ohio St., 477, 154 N. E., 790, has been cited in support of the view that the commission has no authority to act in the premises. In the instant case, however, the Public Utilities Commission does not undertake to make or enforce any requirement as to the kind of appliance to be used, but only attempts to investigate claimed violations of the provisions of the statute relative to the purely intrastate operation of trains and locomotives, and to conduct hearings and make orders relative thereto. Such action is within its jurisdiction.
 

 The power of the Legislature to make and enforce requirements such as that for a full crew in the operation of intrastate trains or locomotives is not questioned. We have only to determine whether this so-called locomotive crane as operated falls within the purview of the provisions of Section 12557-1, General Code. That section reads as follows :
 

 “It shall be unlawful for any common carrier owning or operating an engine or locomotive used to switch cars, to operate such engine or locomotive handling cars in any railroad yard or on any railroad track within the limits of this state unless, each and every such engine or locomotive, while so handling or switching such cars, shall be manned with a full crew of competent employees, which crew shall consist of at least one engineer, one fireman, one conductor, and two helpers; and no such employee shall be detailed to more than one engine at the same time or be put to any other service unless his place be filled by another competent employee, or the engine laid up while short handed, except that
 
 *387
 
 in case of the sudden disability of a member of such crew through sickness, accident or death the employer shall have three hours at terminals and six hours at outlying points in which to replace such member, during which time such engine may be operated short handed.”
 

 If the so-called “locomotive crane” is “an engine or locomotive used to switch cars,” then in its operation as an engine or locomotive in the switching of cars — that is, in propelling cars from one switch track to another — it comes within the requirements of this section. The name by which the propelling power is designated is, of course, entirely immaterial; but its very name, “locomotive crane,” indicates its dual purpose and function. It is a crane that makes possible the moving of materials from car to platform and
 
 vice versa,
 
 which is probably its primary function; but it is also a locomotive, and in its operation as a locomotive it concededly moves cars from track to track, and is therefore used to switch cars. Neither this court nor the Public Utilities Commission can be influenced by the so-called policy of the legislative requirement. It being conceded that the legislative body has the power to enact the legislation, and the meaning of the language employed being clear, the enforcement thereof must follow as a matter of course.
 

 It could scarcely be contended that the requirements of this section had no application to a so-called switch engine or locomotive, even though its services were restricted to the movement of cars from switch to switch,, and it performed the identical functions in that regard as does this locomotive crane. In the use of the word ‘ ‘ engine ” or “ locomo
 
 *388
 
 tive” the Legislature has evinced a purpose to make its requirement cover a self-propelled vehicle, whether properly denominated an engine or locomotive, which is used to switch cars. It is therefore wholly unnecessary to enter into a technical discussion of the terms “engine” and “locomotive.” It is the use of the instrumentality which is the controlling factor, and determines whether or not it is subject to the requirements of the statute as to the crew necessary for its operation. If used only as a crane for the purpose of moving materials, and not as a locomotive or engine in the switching of cars, it of course would not fall within the requirements of this section.
 
 L. S. & M. S. Ry. Co.
 
 v. Benson,
 
 Admr.,
 
 85 Ohio St., 215, 97 N. E., 417, 41 L. R. A. (N. S.), 47, Ann. Cas., 1913A, 945.
 

 It is our conclusion, therefore, that the order of the commission is neither unlawful nor unreasonable, but, on the contrary, is fully warranted by the undisputed facts disclosed by the record. The order is therefore affirmed.
 

 Order affirmed.
 

 Marshall, C. J., Kinkade, Robinson, Jones, Day and Allen, JJ., concur.